## NORTH ATLANTIC DREDGING CO. v. McALLISTER STEAMBOAT CO.

(Circuit Court of Appeals, Second Circuit. January 13, 1913.)

### No. 105.

1. SHIPPING (§ 40*)—CHARTER OF DREDGE—CONSTRUCTION.
    A charter by which respondent hired a dredge from libelant for work in connection with the floating of a sunken vessel, and agreed to pay the crew and for all supplies from the time the vessel left the place where she was then employed until she was returned there, and to furnish all towage, construed, and *held* to entitle the owner to hire during all of such time, and not during the time only when she was at work on the wreck.

    [Ed. Note.—For other cases, see Shipping, Dec. Dig. § 40.*]

2. SHIPPING (§ 50*)—CHARTER OF DREDGE—CONSTRUCTION.
    Where respondent employed a tug to tow the dredge, as required by such charter, but she remained in charge of libelant's master and crew, respondent was not liable as bailee for an injury to the dredge while being towed, but only on proof that the injury occurred through the fault of the towing tug.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 150–155: Dec. Dig. § 50.*]

Appeal from the District Court of the United States for the Southern District of New York; C. M. Hough, Judge.

Suit in admiralty by the North Atlantic Dredging Company against the McAllister Steamboat Company. Decree for libelant, and respondent appeals. Modified and affirmed.

Foley & Martin, of New York City, for appellant.

Kelley & Connelly, of New York City (M. E. Kelley and C. S. Lorentzen, both of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

WARD, Circuit Judge. The libelant and respondent entered into the following contract:

"McAllister Steamboat Company,

"General Offices, 109–111 Broad Street, New York.

"June 22d, 1911.

"We hereby agree to rent to you our pump dredge Irving T., now located at Port Washington, L. I., for work in connection with the floating of the steamer Penobscot on the Hudson river, New York state, on the following condition:

"(1) Subject to a release from the Port Washington Estates of 30 Church St., New York City of the North Atlantic Dredging Company's contract without prejudice to the North Atlantic Dredging Company's contract with the Port Washington Estates.

"(2) The rate of hire per day of 24 hours is to be two hundred and twenty. ($220.00) dollars.

"(3) That the North Atlantic Dredging Company shall furnish the dredge Irving T. and a crew of eighteen men and pay and board same during the period of hire.

"(4) That all towing and individual expenses shall be without costs to the North Atlantic Dredging Company, including to and from where dredges is now working.

"(5) That all fresh water and coal required from the time the dredge leaves Port Washington until it is returned to Port Washington shall be furnished without cost to the North Atlantic Dredging Company.

"(6) That a payment of one thousand ($1000.00) dollars shall be made to the North Atlantic Dredging Company upon the dredge's arrival at the site of the work in the Hudson river.

"That should the rental of the dredge at the price of two hundred and twenty ($220.00) dollars a day be less upon its delivery at Port Washington than one thousand ($1,000.00) dollars for the time of said rental the North Atlantic Dredging Company shall make rebate to McAllister Steamboat Company.

"Should the time of hire consume more than one thousand ($1000.00) dollars at the above rate per day the McAllister Steamboat Company shall pay to the North Atlantic Dredging Company upon the dredge's return to Port Washington any and all moneys accruing above the one thousand ($1,000.00) dollars aforesaid. ·

North Atlantic Dredging Co.,

"Thos. O'Connor, President.

"The McAllister S. B. Co., ·

"Per Jas. P. McAllister, Treas."

The Irving T., having obtained a temporary release from the contract on which she was engaged at Port Washington, started June 22d, 7:30 p. m., to get ready to go to the Penobscot, and left the next morning in tow of the tug J. P. McAllister, belonging to another company, but sent by the respondent. June 25th, at 2 a. m., she arrived at the Penobscot, left there by respondent's orders after working three days, in tow of the same tug, June 28th at 8:30, arrived at Port Washington July 1st, at 2:30 a. m., and resumed work on her interrupted contract at 12:30 p. m.

[1] The respondent contended that the agreement was one for services, and that hire was payable only while the dredge was working; but the District Judge rightly held that the agreement was a charter under which the libelant was entitled to charter hire for every day from the time the dredge got ready to leave Port Washington until she resumed her work there again.

The next question is whether the dredge was fit for the work for which she was chartered, and whether the libelant either im-

pliedly or expressly undertook that she would get the mud from under the bottom of the Penobscot, so as to let the steamer slide from the bank she was on into deep water. The District Judge, although inclined to think that testimony as to negotiations preceding the signing of the charter was not admissible, still did admit it, and has found upon it, as well as upon the document, that the president of the respondent chartered the dredge, relying solely upon his own judgment as to her fitness; there being no express representation or warranty of it made by the libelant nor any agreement to do a specific thing, from which such a warranty could be implied. We agree in this finding.

The parties, "for the purpose of fixing the amount·of damages in the final decree" and to avoid a reference, stipulated that the balance of charter hire due was $741.68. The libelant contends that, an appeal in admiralty being in this circuit a new trial (Munson S. S. Co. v. Miramar S. S. Co., 167 Fed. 960, 93 C. C. A. 360), it may recover more, because the sum stipulated for does not cover the hire day by day from the time the dredge got ready to leave Port Washington until she resumed work there. This might be so, but for the libelant's stipulation, in the face of which it cannot recover more than the amount it has agreed upon as the damage.

The libelant also claims for damages to its pontoons while working at the steamer, which the District Judge rightly disallowed as not being caused by the charterer.

[2] A further claim for $118.26 damage to the dredge's hawsers by the wheel of the tug McAllister while towing he did allow, in the· absence of any proof as to how the damage occurred. . This was on the ground that the respondent was bailee of the dredge, and therefore the burden of proof lay upon it to show that any damage she or her equipment sustained while in its possession was not due to lack of care or skill upon its part, or upon that of its agents. He cited in support of this conclusion Bouker v. Smith (D. C.) 40 Fed. 839; Id., 49 Fed. 954, 1 C. C. A. 481. That, however, was a clear case of the bailment of two scows to a tug, which were injured while in the exclusive possession· and control of the tug. So in the case of W. H. Beard Dredging Co. v. Hughes (D. C.) 113 Fed. 680, the charterer undertook to do the towing, and in the case of Swenson v. Snare & Triest Co., 160 Fed. 459, 87 C. C. A. 443, the dredge was in the exclusive possession of the respondent. The charter party in this case left the dredge in the possession and control of its owner and was in no sense a demise. Clyde Commercial S. S. Co. v. West India S. S. Co., 169 Fed. 275, 94 C. C. A. 551. As the respondent did provide the tug to do the towing, it would be responsible for any negligence on the tug's part causing damage. There being, however, no proof on the subject at all, this claim should have been disallowed.

The decree must be modified, by striking it·out, and, as so modified, is affirmed, without costs of this court.